## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

| | |
|---|---|
| LAUREN WOLF, *individually and on behalf of all others similarly situated*,<br><br>    Plaintiff,<br><br>v.<br><br>AMERICAN NATIONAL BANK & TRUST,<br><br>    Defendant. | Case No. 7:25-cv-54<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Lauren Wolf, individually and on behalf of all others similarly situated, brings this action against Defendant American National Bank & Trust ("ANBT" or "Defendant") to obtain damages, restitution, and injunctive relief for the Class, as defined below. Plaintiff makes the following allegations upon personal knowledge, the investigation of counsel, public record, and information and belief as to all other matters.

## NATURE OF THE ACTION

1.  This class action arises out of a breach of its computer network perpetrated in January of 2025 against Defendant American National Bank & Trust, an independent locally-owned bank. This breach resulted in the unauthorized access and exfiltration of highly sensitive and personal information of Plaintiff and Class Members (the "Data Breach"). The Data Breach was committed by cybercriminals who exfiltrated this information for the purpose of engaging in identity theft to the detriment of and injury to Plaintiff and Class Members.

2.      As a result of the Data Breach, Plaintiff and at least **53,861**[1] Texans, as well as an undetermined number of citizens from other states[2] (the "Class") suffered present injury and damages in the form of identity theft, out-of-pocket expenses, and the value of the time reasonably incurred to remedy or mitigate the effects of the unauthorized access, exfiltration, and subsequent criminal misuse of their sensitive and highly personal information.

3.      Subsequent to the Data Breach, Defendant failed to provide timely notice to Plaintiff and Class Members—thereby exacerbating their injuries—that their data had been exfiltrated by cybercriminals intent on using Plaintiff's and Class Members' personal information for profit, including fraud and identity theft. Ultimately, Defendant deprived Plaintiff and Class Members of the chance to take speedy measures to protect themselves and mitigate harm. Each Class Member received a belated notice of Data Breach letter from ANBT ("Notice Letter").[3]

4.      Upon information and belief, the personally identifiable information[4] ("PII" or "Personal Information") compromised in the Data Breach included, *inter alia*, full names, financial account numbers, and Social Security numbers.[5] The Data Breach likely includes other "personal information" that ANBT failed to list specifically or otherwise disclose to the public, Plaintiff, and Class Members.

---

[1] *See* https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (showing three different notification dates) (last accessed June 3, 2025).
[2] *See, e.g.,* https://oag.ca.gov/ecrime/databreach/reports/sb24-603161 (last accessed June 3, 2025).
[3] *See* Plaintiff's Notice Letter, attached as Exhibit A.
[4] Guidance on the Protection of Personal Identifiable Information, U.S. Department of Labor, https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=2ahUKEwi5wOD_tJWEAxUlcDABHekhCDEQFnoECBgQAw&url=https%3A%2F%2Fwww.dol.gov%2Fgeneral%2Fppii%23%3A~%3Atext%3DPersonal%2520Identifiable%2520Information%2520(PII)%2520is%2Ceither%2520direct%2520or%2520indirect%2520means.&usg=AOvVaw1g_gLjRnuigqUumsnSnh-l&opi=89978449 (last accessed June 3, 2025).
[5] *Id.*

5.      The specific data which was compromised in ANBT's Data Breach is highly sensitive, protected information that can and almost certainly will be used to commit identity theft against Plaintiff and Class Members.

6.      Plaintiff brings this class action lawsuit individually and on behalf of all others similarly situated to address Defendant's inadequate safeguarding of Plaintiff's and Class Members' PII and failure to provide timely and adequate notice to Plaintiff and Class Members that their information had been subject to the unauthorized access of a criminal, third party.

7.      Upon information and belief, Defendant maintained Plaintiff's and Class Members' PII in a reckless manner. As evidenced by the Data Breach, Plaintiff's and Class Members' PII was stored on Defendant's computer system and network unencrypted and vulnerable to cyberattacks.

8.      The potential for a cyberattack and subsequent improper disclosure of Plaintiff's and Class Members' Personal Information was a known to Defendant, and thus, Defendant was on notice of the risk that failing to secure Plaintiff's and Class Members' PII from a cyberattack presented.

9.      Armed with Plaintiff's and Class Members' PII accessed in the Data Breach, data thieves can commit a variety of crimes, including but not limited to fraudulently applying for unemployment benefits, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to target other hacking intrusions based on their individual needs, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and providing false information to police during an arrest.

3

10.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft.

11.     Plaintiff and Class Members have and, in the future, may incur actual monetary costs, including but not limited to the cost of purchasing credit monitoring services, credit freezes, credit reports, and other protective measures to deter and detect identity theft.

12.     Plaintiff and Class Members have suffered—and will continue to suffer—from the loss of the benefit of their bargain, unexpected out-of-pocket expenses, lost or diminished value of their PII, and emotional distress.

13.     Plaintiff and Class Members have and will be required to expend time spent mitigating the effects of the Data Breach, including actual and attempted fraud and identity theft.

14.     Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose PII was accessed during the Data Breach, identifiable by the list of individuals to whom ANBT has sent or has attempted to send a Notice Letter.

15.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

16.     Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate, long-term credit monitoring services funded by Defendant.

17.     Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct and asserts claims for (i) negligence, (ii) negligence *per se*, (iii) breach of implied contract, and (iv) unjust enrichment.

4

## PARTIES

18.     Plaintiff Lauren Wolf is and at all times mentioned herein was a natural person and citizen of the State of Texas residing in the City of Fort Worth in Tarrant County.

19.     Defendant American National Bank & Trust is bank incorporated in Texas with its principal place of business located at 2732 Midwestern Parkway, Wichita Falls, TX 76308. It can be served through its registered agent: Roy T. Olsen, 2732 Midwestern Parkway, Wichita Falls, TX 76308.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant based upon its notification of individuals in other states.

21.     The Court has general personal jurisdiction over Defendant because it maintains its headquarters in Texas, regularly conducts business in Texas, has sufficient minimum contacts in Texas, and committed tortious acts in Texas.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the district within which ANBT has the most significant contacts, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District

## FACTUAL ALLEGATIONS
### *Defendant Collected and Stored the PII of Plaintiff and Class Members*

23.     Defendant ANBT is "an independent, locally-owned bank headquartered in Wichita Falls, American National Bank & Trust ranks as the largest, independently owned financial institution in our area with more than $2.1 billion in assets." "Chartered in 1976, the

bank currently has branches in Wichita Falls, Iowa Park, Archer City, Chillicothe, Quanah, Flower Mound, downtown Fort Worth, Denton, Roanoke and a Loan Production Office in north Dallas."[6]

24.    As it conducts its business, ANBT collects and accepts highly sensitive PII from its customers and employees, including Plaintiff and Class Members. If any customer refuses to provide the required PII, upon information and belief, ANBT will not provide services to that customer. If a prospective or current employee refuses to provide the required PII, upon information and belief, ANBT will not provide or continue to provide employment to that person.

25.    In the ordinary course of doing business with Defendant, customers and employees were required to (and Plaintiff and Class Members did in fact) provide ANBT with PII such as:

- Name, address, phone number, and email address;

- Date of birth;

- Demographic information;

- Social Security number;

- Driver's license number;

- Photo identification;

- Employer information;

- Salary and pay information; and

- Detailed credit information.

---

[6] https://www.amnat.com/about/ (last visited June 3, 2025).

26.    Plaintiff and Class Member provided their PII to Defendant for the purposes of facilitating services from and employment with Defendant and with the agreement and understanding that the PII would be adequately safeguarded and/or destroyed within a reasonable time after the termination of the respective relationship.

27.    Plaintiff and the Class Members, as current or former banking customers or employees, reasonably relied on Defendant to keep their sensitive PII confidential; to maintain its system security; to use this information for business purposes only; and to make only authorized disclosures of their PII.

28.    Because of the highly sensitive and personal nature of the information Defendant acquires and stores, Defendant knew or reasonably should have known that it must comply with federal and state laws protecting customers' PII and provide adequate notice to customers and employees if their PII is disclosed without proper authorization.

29.    Because of the highly sensitive and personal nature of the information Defendant acquires and stores, Defendant knew or reasonably should have known that Plaintiff and the Class Members reasonably relied on Defendant to keep their sensitive PII confidential; to maintain its system security; to use this information for business purposes only; and to make only authorized disclosures of their PII.

30.    By obtaining, collecting, receiving, and/or storing Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew, or should have known, that it was thereafter responsible for protecting Plaintiff's and Class Members' PII from unauthorized disclosure.

31.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII, including but not limited to, protecting their usernames and

passwords, using only strong passwords for their accounts, and refraining from browsing potentially unsafe websites.

32.    Upon information and belief, Defendant does not follow its own policies or industry standard practices in securing customers' and employee's PII.

33.    Upon information and belief, Defendant failed to ensure the proper monitoring and logging of the ingress and egress of network traffic.

34.    Upon information and belief, Defendant failed to ensure the proper monitoring and logging of file access and modifications.

35.    Upon information and belief, Defendant failed to ensure the proper implementation of sufficient processes to quickly detect and respond to data breaches, security incidents, or intrusions.

36.    Upon information and belief, Defendant failed to ensure the proper encryption of Plaintiff's and Class Members' PII and monitor user behavior and activity to identify possible threats.

37.    Upon information and belief, Defendant inadequately trains its employees and cybersecurity partners on cybersecurity policies and then fails to enforce those policies.

38.    Upon information and belief, Defendant failed to maintain reasonable and adequate security practices over its systems storing Plaintiff's and Class Members' PII.

***The Data Breach***

39.    In or about May of 2025, ANBT sent Notice Letters to Plaintiff and Class Members notifying them of the Data Breach. Plaintiff's letter stated:

**What Happened?**

On January 22, 2025, we identified unauthorized access to our network. Upon identifying this unauthorized access, we immediately took steps to

secure the network, including the information contained thereon. … The investigation determined that the unauthorized access occurred between January 21 and January 22, 2025. On April 28, 2025, we determined that a file containing your personal information was accessed without authorization. …

**What information was Involved?**

The information included your name in combination with your Social Security number.[7]

40.     In its Notice Letter, Defendant arranged for a year of credit monitoring "designed to detect potential misuse of your information" and "promptly identifying and resolving anu instances of identity theft."[8]

41.     Although the Data Breach began on January 2025, it was not until May 23, 2025—four months later—that Defendant notified some or all members of the Class, including Plaintiff, and the public.

42.     Plaintiff and the Class Members remain in the dark regarding the exact extent of the data was stolen and what steps are being taken, if any, to secure their PII and financial information going forward. Plaintiff and Class Members are left to speculate as to the full impact of the Data Breach and exactly how Defendant intends to enhance its information security systems and monitoring capabilities so as to prevent further breaches.

43.     Following the Breach and recognizing that each Class Member is now subject to the present and continuing risk of identity theft and fraud, Defendant advised impacted individuals to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity over the next 12 to 24 months."[9] Defendant also advised Plaintiff and Class Members to place a fraud alert with the three major

---

[7] *See* Exhibit A.
[8] *Id.*
[9] https://oag.ca.gov/system/files/ANBT%20-%20California%20Notification.pdf.

credit bureaus, to update passwords, and to place a freeze on their credit file with the credit bureau.[10]

44.    Defendant largely put the burden on Plaintiff and Class Members to take measures to protect themselves.

45.    Defendant was aware of its data security obligations and understands that those obligations are particularly important given the substantial increase in data breaches for businesses that collect and store PII preceding the date of the breach.

46.    Cyberattacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack.

47.    Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and the data when Defendant knew or reasonably should have known of the high degree of risk of a data breach compromising the PII of Plaintiff and Class Members. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

       a.  Failing to maintain an adequate data security system to reduce the risk of cyber-attacks and data breaches;

       b.  Failing to adequately protect the PII of its customers and employees;

       c.  Failing to properly monitor its own data security systems for existing intrusions so as to enable Defendant to quickly stop any attack and mitigate the harm;

---

[10] *Id.*

> d. Failing to ensure that vendors with access to Defendant's protected information employed reasonable security procedures;
>
> e. Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act; and,
>
> f. Failing to adhere to industry standards for cybersecurity.

48. As the result of its inadequate security and procedures, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII.

49. Given the sensitive nature of the Personal Information and financial information that Defendant held and the repeated warnings of cyberattacks, Defendant's security failure—including its failure to maintain Plaintiff's and Class Members' PII in an encrypted state—amounts to not only negligence, but reckless behavior.

50. In its Notice Letters to Plaintiff and the Class, ANBT admits that after the Data Breach, "we have taken additional steps to enhance our security measures"[11] These measures could have—and should have—been in place prior to the Data Breach, and likely could have prevented the Data Breach from occurring.

51. Despite its lag in notification of the Data Breach that affected customers, ANBT offered victims of the attack just one year of identity theft services through Epiq Privacy Solutions ID.

52. Based on the Notice of Data Breach letter Plaintiff received, which informed Plaintiff that her Personal Information (including her name and Social Security number) was "accessed," Plaintiff reasonably believes that her PII was intentionally targeted for the purpose of committing identity fraud and selling such PII on the Dark Web and elsewhere.

---

[11] *See, e.g.*, Plaintiff's Notice Letter, attached as Exhibit A.

53.     Due to Defendant's insufficient security measures and the resulting Data Breach, Plaintiff and the Class Members now face a heightened and imminent risk of fraud and identity theft.

### *Texas Data Breach Notification Statutes*

54.     The State of Texas requires that any "person who conducts business in this state and owns or licenses computerized data that includes sensitive personal information shall disclose any breach of system security, after discovering or receiving notification of the breach, to any individual whose sensitive personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Tex. Bus. & Com. Code Ann.§ 521.053(b). In fact, "breach of a security system" is defined as "[the] unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of sensitive personal information." Tex. Bus. & Com. Code Ann.§ 521.053(a).

55.     Because Defendant issued the data breach notification disclosure as required by Tex. Bus. & Com. Code. Ann. § 521.053, following the investigation, Defendant must have concluded that Plaintiffs and Class Members' "sensitive personal information was, or is reasonably believed to have been acquired by an unauthorized person." Tex. Bus. & Com. Code Ann. § 521.053. And this is consistent with the language in the notice letter that the data was not only accessed but also acquired -i.e., "copied" by the threat actors.

### *Defendant Failed to Comply with FTC Guidelines*

56.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

57.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[12]

58.     The FTC guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[13]

59.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

60.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data (like the Personal Information in this matter), treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting

---

[12] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed June 3, 2025).
[13] *Id.*

from these actions further clarify the measures businesses must take to meet their data security obligations.

61.    Defendant failed to properly implement basic data security practices.

62.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to the PII of its customers constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

63.    Upon information and belief, Defendant was at all times fully aware of its obligation to protect the PII of its customers. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *Defendant Fails to Comply with Industry Standards*

64.    As noted above, experts studying cyber security routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the PII which businesses collect and maintain.

65.    Several best practices have been identified that at a minimum should be implemented by businesses like Defendant, including but not limited to implementing exhaustive employee education; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and sensitive data access controls. Defendant failed to follow these industry best practices.

66.    Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protecting physical security systems and;

training staff regarding critical access points. Defendant failed to follow these cybersecurity best practices.

67.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

68.    Defendant failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the data breach.

### Data Breaches Put Consumers at an Increased Risk of Fraud and Identify Theft

69.    Data Breaches such as the one experienced by Defendant are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

70.    In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach. Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. *See* GAO chart of consumer recommendations.[14] It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiff(s) and Class) must take after a breach like Defendant's are both time consuming and of only limited and short-

---

[14] https://www.gao.gov/assets/gao-19-230.pdf (last accessed June 3, 2025).

term effectiveness.

71.     The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record," discussing the same in a 2007 report as well ("2007 GAO Report").[15]

72.     The FTC, like the GAO (*see* Footnote 14), recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[16]

73.     Theft of Private Information is also gravely serious. PII is a valuable property right.[17]

74.     It must also be noted there may be a substantial time lag between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for

---

[15] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last accessed June 3, 2025) ("2007 GAO Report").

[16] *See* https://www.identitytheft.gov/Steps (last accessed June 3, 2025).

[17] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* 2007 GAO Report, at p. 29.

75.    Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

76.    There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must vigilantly monitor their financial accounts for many years to come.

77.    Victims of a data breach are exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it by selling the data on the black market where other thieves take over victims' identities to engage in illegal financial transactions under the victims' names.

78.    Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or otherwise harass or track the victim.  For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

79.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit and correcting their credit reports.[18]

80.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud and bank/finance fraud.

81.     One such example of criminals using PII for profit is the development of "Fullz" packages.[19]

82.     Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

---

[18] *See IdentityTheft.gov*, Federal Trade Commission, https://www.identitytheft.gov/Steps (last accessed June 3, 2025).

[19] "Fullz" is a term used for collected data from different sources that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm, Krebs On Security, https://krebsonsecurity.com/tag/fullz/ (las accessed June 3, 2025).

83.     The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a "Fullz" package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members.

84.     Personal Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

85.     There is a strong probability that entire batches of the PII taken from ANBT have been dumped on the black market and are yet to be dumped on the black market—including names and Social Security numbers—meaning Plaintiff and Class Members face a substantial and imminent risk of fraud and identity theft now and for many years into the future.

86.     Sensitive Personal Information can sell for as much as $363 per record according to the Infosec Institute.[20] PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[20] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last accessed June 3, 2025).

87.     The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[21] Such fraud may go undetected until debt collection calls commence months, or even years, later.

88.     Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[22]

89.     Each of these fraudulent activities is difficult to detect. An individual may not know that his Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

90.     Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[23]

91.     Data like a Social Security number, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security [n]umbers are worth more than 10x on the black market."[24]

---

[21] *Identity Theft and Your Social Security Number*, Social Security Administration (2018) at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed June 3, 2025).
[22] *Id.* at 4.
[23] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed June 3, 2025).
[24] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-

*Elderly Populations Are Reluctant to Change After a Data Breach*

92.    In 2020, the AARP sponsored Javelin Strategy Research to do a report on identity fraud strategies for Americans aged 55 years and older. While this report and its related research show that elders experience similar rates of being victims or identity fraud as the overall U.S. population, it also indicates certain troublesome patterns among this population.[25]

93.    After being a victim of identity fraud, "[c]onsumers aged 65+ typically do not change how they shop, bank, or pay following a fraudulent event. A surprising 70% of consumers 65 and older exhibit reluctance to change familiar habits."[26] This reluctance increases the risks that elders face after a data breach like that at ANBT.

94.    For Americans 55+ years old, Javelin's research has shown that they are more likely to use identity theft protection, credit report security freezes, and credit monitoring than the overall U.S. population.[27]

95.    Since elders are more likely to rely on the type of credit monitoring services that ANBT has offered, albeit for only one year, and because a significant number of the victims of the ANBT Data Breach are likely to be over 55 years old, ANBT's offer of free credit monitoring is woefully inadequate. The Class's PII is likely to be exploited for years, yet ANBT's relief is limited.

*Plaintiff's Experience*

<u>Plaintiff Lauren Wolf</u>

---

hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed June 3, 2025).
[25] Identity Fraud in Three Acts: A Consumer Guide, available at: https://www.aarp.org/content/dam/aarp/home-and-family/family-and-friends/2020/10/aarp-Identity-fraud-report.pdf, at 8 (last accessed June 3, 2025).
[26] *Id.* at 9.
[27] *Id.* at 8.

96.     Plaintiff Wolf was a former banking customer of American National Bank & Trust. When she initially began banking at ANBT, she was required to provide ANBT with her Personal Information, including but not limited to her name, contact information, financial information, and her Social Security number.

97.     At all relevant times, Plaintiff Wolf took reasonable measures to protect her PII and online presence.

98.     On or about May 29, 2025, Plaintiff Wolf received a mailed Notice of Data Breach Letter, related to ANBT's Data Breach that occurred in January of 2025. *See* Notice Letter, attached as Exhibit A.

99.     The Notice Letter that Plaintiff Wolf received informed her that her critical PII was accessed by an "unauthorized party." The letter stated that the accessible information included her "name in combination with your Social Security number" but did not expand on whether additional information was stolen as well. *See* Exhibit A. Without further information through discovery, Plaintiff Wolf cannot be certain of the extent of her breached PII.

100.     Plaintiff Wolf is alarmed by the fact that her Social Security number was identified as among the breached data on ANBT's computer system.

101.     Shortly after and as a result of the Data Breach, Plaintiff Wolf began receiving a significantly higher number of spam emails, calls, and texts. She currently receives about 15 spam contacts each day.

102.     As a result of the Data Breach and at the recommendation of Defendant, Plaintiff Wolf has monitored her financial accounts more often. She spends about two hours per week doing so, which is time that she cannot spend on activities she would prefer. She also has since changed her passwords and checks in with her bank account more often to deter identity theft.

103.    To deter or hopefully prevent becoming a victim of identity theft, she has also purchased Life Lock and had a dark web search performed to see if her data has already been sold.

104.    As a result of the Breach, Plaintiff Wolf has suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has experienced anxiety and increased stress for the loss of her privacy, as well as anxiety over the impact of cybercriminals accessing and using her PII and/or financial information.

105.    Plaintiff Wolf is aware that cybercriminals often sell PII and use it for other criminal purposes and that such actions could continue for years after the Data Breach.

106.    Had Plaintiff Wolf been aware that ANBT's computer systems were not secure, she would not have entrusted ANBT with her Personal Information, especially including herSocial Security number.

107.    As a result of the Data Breach, Plaintiff Wolf anticipates spending time and money on an ongoing basis to try to mitigate and address harm caused by the Data Breach.

108.    As a result of the Data Breach, Plaintiff Wolf is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her PII and financial information, in combination with her name, being placed in the hands of unauthorized third parties/criminals.

109.    Plaintiff Wolf has a continuing interest in ensuring that her PII and financial information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches or deleted altogether. Damages from a future breach due to Defendant's inadequate data security represent an irreparable injury (such as the

further loss of privacy and exposure of PII such as social security numbers) for which no adequate remedy at law exists.

### *Plaintiff's and Class Members' Damages*

110.    To date, Defendant has done little to absolutely nothing to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach and data breach.

111.    Moreover, ANBT has offered only a paltry one year of identity theft monitoring and identity theft protection. This one-year limitation is inadequate when ANBT's victims are likely to face many years of identity theft.

112.    Furthermore, Defendant ANBT's credit monitoring offer and advice to Plaintiff and Class Members squarely places the burden on Plaintiff and Class Members, rather than on the Defendant, to monitor and report suspicious activities to law enforcement. In other words, ANBT expects Plaintiff and Class Members to protect themselves from its tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiff and Class Members in credit monitoring services upon discovery of the breach, Defendant merely sent instructions to Plaintiff and Class Members about actions they can affirmatively take to protect themselves.

113.    These services are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud, and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' PII.

114.    These services are also inadequate as ANBT fails to acknowledge that many of the victims of its Data Breach are elderly or infirmed and may not be able to adequately protect themselves from fraud and identity theft.

115.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

116.    Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, credit card fraud, tax return fraud, medical services billed in their names, utility bills opened in their names, and similar identity theft.

117.    Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII.

118.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

119.    Plaintiff and Class Members also suffered a loss of value of their Personal Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

120.    Class Members were also damaged via benefit-of-the-bargain damages. Part of the price these Class Members paid to Defendant was intended to be used by Defendant to fund adequate security of Defendant's computer property and Class Members' Personal Information. Thus, the Class Members did not get what they paid for. Specifically, they overpaid for services that were intended to be accompanied by adequate data security but were not.

121.    Plaintiff and Class Members suffered actual injury from having their PII compromised in the Data Breach including, but not limited to, damage to and diminution in the value of their PII (a form of personal property that Defendant obtained from Plaintiff), and violation of their privacy rights.

122.    Plaintiff and Class Members have been damaged by the compromise of their Personal Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

123.    As a result of the Data Breach and the recommendations of Defendant, Plaintiff and Class Members have spent and will continue to spend significant amounts of time monitoring their financial accounts and records for misuse.

124.    Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach.

125.    In addition, many Class Members suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a.    Finding fraudulent charges;

b.    Canceling and reissuing credit and debit cards;

c.    Purchasing credit monitoring and identity theft prevention;

d.    Addressing their inability to withdraw funds linked to compromised accounts;

e.    Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f.    Placing "freezes" and "alerts" with credit reporting agencies;

g.    Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h.    Contacting financial institutions and closing or modifying financial accounts;

i.     Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j.     Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k.     Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

126.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Personal Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online, is encrypted, and is password-protected. Damages from a future breach due to Defendant's inadequate data security represent an irreparable injury (such as the further loss of privacy and exposure of PII such as Social Security numbers) for which no adequate remedy at law exists.

## CLASS ACTION ALLEGATIONS

127.    Plaintiff brings this action individually and on behalf of all other persons similarly situated (the "Class") under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

128.    Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

All persons whose Personal Information was compromised as a result of the Data Breach suffered by Defendant in January 2025.

129.    Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys,

successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

130.    Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery. The proposed Class meets the criteria for certification.

131.    <u>Numerosity</u>.  The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, and according to its Notice letter, its investigation is ongoing, the Class consists of at least **58,000** individuals whose data was compromised in the Data Breach.

132.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members.  These common questions of law and fact include, without limitation:

a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Personal Information;

b.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.    Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.    Whether Defendant owed a duty to Class Members to safeguard their Personal Information;

f.      Whether Defendant breached its duty to Class Members to safeguard their

Personal Information;

g.      Whether Defendant knew or should have known that its data security

systems and monitoring processes were deficient;

h.      Whether Plaintiff and Class Members suffered legally cognizable damages

as a result of Defendant's misconduct;

i.       Whether Defendant's conduct was negligent and;

j.       Whether Plaintiff and Class Members are entitled to damages and/or

injunctive relief.

133.    Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Personal Information, like that of every other Class Member, was compromised in the Data Breach.

134.    Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

135.    Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

136.    Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact

is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

137.    Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

138.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Personal Information;

b.    Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

c.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

d.    Whether Defendant's failed to take commercially reasonable steps to safeguard consumer Personal Information; and

e.    Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

139.    All members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

140.    Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## CAUSES OF ACTION

### First Count
### Negligence
### (On Behalf of Plaintiff and All Class Members)

141.    Plaintiff realleges and incorporates by reference the allegations above as if fully set forth herein.

142.    Defendant had a duty of care to use reasonable means to secure and safeguard its computer systems and network—and Class Members' Personal Information held within—to prevent disclosure of that information and to safeguard it from theft.

143.    Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and give prompt notice to those affected.

144.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and applicable law and to ensure that its systems and

networks—and the personnel responsible for them—adequately protected the Personal Information.

145.    Defendant's duty of care to use reasonable security measures arose due to the special relationship that existed between it and the Class, which is recognized by laws and regulations including but not limited to common law.  Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

146.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

147.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant was bound by common law and industry standards to protect confidential Personal Information.

148.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Personal Information. The specific negligent acts and omissions committed by Defendant includes, but are not limited to, the following:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Personal Information;

b.    Failing to adequately monitor the security of its networks and systems;

c.    Failure to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d.    Allowing unauthorized access to Class Members' Personal Information;

e.  Failing to detect in a timely manner that Class Members' Personal Information had been compromised; and

f.  Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

149.  It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Personal Information would result in injury to Class Members. The breach of security was reasonably foreseeable given the high frequency of published data breaches in recent years.

150.  Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

151.  Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate, long-term credit monitoring and identity theft protection to all Class Members.

<u>**Second Count**</u>
**Negligence *Per Se***
**(On Behalf of Plaintiff and All Class Members)**

152.  Plaintiff realleges and incorporates by reference the allegations above as if fully set forth herein.

153.  Pursuant to the FTCA, ANBT was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class Members' Personal Information.

154.    ANBT breached its duties by failing to employ industry standard data and cybersecurity measures, including, but not limited to, implementing proper data segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

155.    It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff's and Class Members' Personal Information in compliance with applicable laws would result in an unauthorized third-party gaining access to ANBT's networks, databases, and computers that stored or contained Plaintiff's and Class Members' Personal Information.

156.    Plaintiff's and Class Members' Personal Information constitutes valuable personal property that was stolen due to ANBT's negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

157.    ANBT's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' unencrypted Personal Information.

158.    Plaintiff and Class Members have suffered and will continue to suffer damages as a result of ANBT's conduct. Plaintiff and Class Members seek damages and other relief as a result of ANBT's negligence.

**<u>Third Count</u>**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and All Class Members)**

159.    Plaintiff realleges and incorporates by reference the allegations above as if fully set forth herein.

160.     ANBT provides or has in the past provided banking services to Plaintiff and Class Members. Plaintiff and Class Members also formed an implied contract with Defendant regarding their respective financial agreements.

161.     Through Defendant's performance of, sale of, and/or purchase of financial services, it knew or should have known that it must protect Plaintiff's and Class Members' confidential Personal Information in accordance with ANBT's policies, practices, and applicable law.

162.     As consideration, Plaintiff and Class Members paid money to ANBT for banking services, and turned over valuable PII to Defendant. Accordingly, Plaintiff and Class Members bargained with ANBT to securely maintain and store their Personal Information.

163.     ANBT violated these contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class Members' Personal Information and by disclosing it for purposes not required or permitted under the contracts or agreements.

164.     Plaintiff and Class Members have been damaged by ANBT's conduct, including by paying for data and cybersecurity protection that they did not receive, as well as by incurring the harms and injuries arising from the Data Breach now and in the future.

165.     As a result of Defendant's breach of implied contract, Plaintiff and the Class Members are entitled to and demand actual, consequential, and nominal damages.

**Fourth Count**
**Unjust Enrichment**
**(On Behalf of Plaintiff and All Class Members)**

166.     Plaintiff realleges and incorporates by reference the allegations above as if fully set forth herein.

167.    Plaintiff and Class Members conferred a benefit on ANBT by paying for banking products and services, the exchange of which should have included reasonable data and cybersecurity protection for Plaintiff's and Class Members' Personal Information. Such reasonable data and cybersecurity protection was not provided to Plaintiff and Class Members.

168.    ANBT has retained the benefits of its unlawful conduct including the amounts received for data and cybersecurity practices that it did not provide. Due to ANBT's conduct alleged herein, it would be unjust and inequitable under the circumstances for ANBT to be permitted to retain the benefit of its wrongful conduct.

169.    Plaintiff and the Class Members are entitled to (1) a refund of monies in an amount equal to what ANBT should have spent to protect to Plaintiff's and Class Members' Personal Information; (2) restitution and/or damages from ANBT; and (3) an order from this Court proportionally disgorging all profits, benefits, and other compensation obtained by ANBT from its wrongful conduct. If necessary, the establishment of a constructive trust from which Plaintiff and Class Members may seek restitution or compensation may be created.

170.    Additionally, Plaintiff and the Class Members may have no adequate remedy at law against ANBT, and accordingly, plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays for judgment as follows:

a) For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class;

b) For equitable relief, enjoining Defendant from (1) engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of

Plaintiff's and Class Members' Personal Information, and (2) refusing to issue prompt, completes and accurate disclosures to Plaintiff and Class Members;

c)  For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Personal Information compromised during the Data Breach;

d)  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e)  Ordering Defendant to pay for lifetime credit monitoring services for Plaintiff and the Class;

f)  For an award of actual damages and compensatory damages in an amount to be determined, as allowable by law;

g)  For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

h)  Pre- and post-judgment interest on any amounts awarded; and

i)  Such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: June 4, 2025                                   Respectfully submitted,


                                                      */s/ Jarrett L. Ellzey*
                                                      Jarrett L. Ellzey
                                                      Texas Bar No. 24040864
                                                      Leigh Montgomery
                                                      Texas Bar No. 24052214
                                                      **ELLZEY & ASSOCIATES, PLLC**
                                                      4200 Montrose Blvd., Suite 200
                                                      Houston, Texas 77006
                                                      Tel: (888) 350-3931
                                                      Fax: (888) 276-3455
                                                      jellzey@eksm.com
                                                      lmontgomery@eksm.com


                                                      Danielle L. Perry*
                                                      Ra Amen*
                                                      **MASON LLP**
                                                      5335 Wisconsin Avenue, NW
                                                      Suite 640
                                                      Washington, DC 20015
                                                      Tel: (202) 429-2290
                                                      dperry@masonllp.com
                                                      ramen@masonllp.com

                                                      *Counsel for Plaintiff and the Proposed Class*

                                                      **pro hac vice* application to follow